Receipt number 9998-4417080

FILED
Jan 12 2018
U.S. COURT OF
FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| NEBIL OZGEN,<br>    Plaintiff,<br><br>Vs.<br><br>THE UNITED STATES OF AMERICA,<br>    Defendant | No. 18-67 T<br><br>**COMPLAINT**<br><br>Suit for Refund, Credit, or Illegal Exaction of a $700.000 Overpayment For the Tax Year 2011 |

## I. INTRODUCTION

1. Plaintiff Nebil Ozgen, an individual, calendar year, cash basis taxpayer, overpaid his 2011 federal income tax liability, as defined in the broader sense to include additions to tax and interest, by about $700.000. He timely made two formal refund claims for that sum by amending his original return, and made informal claims as well.

2. He was never formally notified of disallowance of all or part of his claim, but for the first time a few days ago was informally notified of its full disallowance, though no reason was given and not only had that same examining office which disallowed it months before confirmed that the position he had taken on his amended 2011 returns which gave rise to the $700.000 overpayment was correct, at that time a few days ago denied it had ever considered his claim in a way that "counts," whatever that means, and so denied disallowing it.

3. No matter what, six months having passed from the date of claim(s) without approval, Taxpayer sues for (1) refund of that overpayment; or in an alternate theory of recovery, (2) credit for that overpayment; or, in another alternate theory, (3) an illegal exaction for wrongful retention of that overpayment.

4. All claims are solely in respect of the tax (calendar) year ending December 31, 2011, but nothing herein should be read as waiving any right of Taxpayer, by amendment or plenary action, to bring such or similar suit in any court of competent jurisdiction for any other year.

## II. JURISDICTION

5   The Tucker Act is the primary statute establishing the limited jurisdiction of this court. 28 U.S.C. § 1491(a)(1). In relevant part, the statute provides that this court "shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States."

6   The Tucker Act provides the waiver of sovereign immunity necessary to sue the United States for money damages, but the plaintiff must establish an independent substantive right to damages, that is, a money-mandating source within a contract, regulation, statute, or Constitutional provision, for the case to proceed. The alleged source of the substantive right to damages must "be reasonably amenable to the reading that it mandates a right of recovery in damages. While the premise to a Tucker Act claim will not be 'lightly inferred,' . . . a fair inference will do."

7   In addition, the Tucker Act confers jurisdiction on the Court of Federal Claims over suits specifically for the refund of taxes, concurrently with the United States district courts.

8   The Supreme Court has limited the jurisdiction of this court in tax refund suits to those claims in which the taxpayer has paid fully all tax assessed for the tax year at issue prior to the initiation of the claim

9   The Federal Circuit has held that this full payment rule is applicable to tax refund claims brought pursuant to 28 U.S.C. § 1346(a)(1) as well.

10   As noted, ¶ I.4, this suit is, for now, confined to claims for refund, credit, or illegal exaction in respect of a $700.000 overpayment of Plaintiff's tax liability for 2011. Because (1) Taxpayer has paid the entirety of all self-assessed and government-assessed liabilities for that year, and for the following year for which the overpayment was to be credited, even without considering that credit; and (2) both years are, with limited exception(s), closed to any further assessment; therefore, this court has jurisdiction in all respects.

## III. FACTUAL BACKGROUND

### A. The 2011 1040 and 1040X, Prior to 2017

11. On October 15, 2012, Taxpayer timely filed a form 1040 federal income tax return for 2011, self-assessing and paying with the return approximately $657.000. He had paid no estimated tax for 2011, whether directly or by credit from another year

12. In or about late 2013, Taxpayer was assessed for 2011 what would over time accrete to approximately $43.000 in penalties and interest for failure to pay that estimated tax for 2011.

13. In early 2014, Taxpayer requested and received a CDP-equivalent hearing to stop all collection efforts with respect to that $43.000.

14. In August 2014, Taxpayer and the government settled the hearing by agreeing that Taxpayer would pay the $43.000 in protest while reserving all rights to claim a refund of it, and the $657.000 of tax, which by then Taxpayer knew had been overpaid but for which he had not yet claimed a refund, formally or informally, "in the ordinary course". The settlement confirms that neither the merits of the penalty or the underlying tax liability were addressed:

> The determination of Appeals is:
>
> Taxpayer has agreed to close this CDP proceeding without a collection alternative by remitting the approximately $43,000 at issue within 30 days, full payment of the posted liability to be paid by September 17, 2014. Appeals and the taxpayer both understand the taxpayer will be remitting full payment solely to stop any levy or similar collection proceeding and the payment is not as a concession of substantive liability, and the taxpayer will retain all rights to seek refund of (1) all or part of the amount shown as overpaid on the amended return to be submitted in the "ordinary course" and (2) the penalties and interest at issue in this case.
>
> Therefore, the taxpayer has determined not to file an amended return through the CDP Appeals process but rather in the "ordinary course" to preserve his Appeals rights. Appeals acknowledges that the taxpayer's liability was not considered within this CDP hearing process.

<sub>15</sub>   Taxpayer timely paid the $43.000, under protest and with reservation.

<sub>16</sub>   On April 14, 2015, Taxpayer timely filed a form 1040X for 2011, with a formal demand for refund of approximately $650.000, resulting from (1) his miscalculation of his gross income; and (2) his claim, as of right, for foreign tax credits not claimed on the original return.

<sub>17</sub>   On October 15, 2015, Taxpayer timely amended that claim to (1) include a claim for refund of the $43.000 of interest and penalty for failure to pay estimated tax for 2011; and (2) request that the resulting $693.606 overpayment be a credit elect against his 2012 tax liability, by statute thus (upon approval) deemed a payment of estimated tax therefor.

<sub>18</sub>   On or about October 26, 2015, Taxpayer received this letter from the Service advising him that his refund claim "had to be sent to Appeals:"

> Dear Taxpayer:
>
> Thank you for your amended return of Apr. 14, 2015.
>
> We have forwarded your amended return to our Appeals department for review. Since they were previously involved with this account they have to review the changes you are requesting. They will contact you if they need any further information regarding your amended return.

<sub>19</sub>   In December 2015, Taxpayer called the Appeals officer who had handled the CDP-equivalency, and was told the refund claim was pending there.

**B.   The 2012 1040 and 1040X, Prior to 2017**

<sub>20</sub>   On October 15, 2013, Taxpayer timely filed a form 1040 federal income tax return for 2012, self-assessing and paying with it approximately $3.500.

<sub>21</sub>   As this occurred prior to the amendment of Taxpayer's 2011 return, the 2012 return as originally filed did not incorporate the $693.606 credit-elect Taxpayer would go on to claim in 2015 in his refund claim for 2011. ¶ III.A.17.

<sub>22</sub>   On April 15, 2016 Taxpayer timely filed a form 1040X for 2012, reflecting the $693.606 credit elect from 2017, as well as adding certain itemized deductions he had not claimed originally, and asked that the resulting $695.051 overpayment in 2012 be credited against his 2013 tax return.[1]

---

[1] Reflects errors TP found in pendency of 2012 refund claim, reported to Service Nov. 2017.

### C. The 2017 Examination(s)

23. On October 15, 2014, Taxpayer timely filed his 2013 form 1040.

24. In or about early 2015 Taxpayer was assessed approximately $280.000 for an underpayment of tax on that 2013 return.

25. Taxpayer requested a CDP hearing, which request was acknowledged timely by a letter telling him, "Don't call us, we'll call you when we're ready."

26. Nevertheless, despite the CDP demand, which the Service acknowledged had been timely made, the case went improperly into collections, assigned to a Revenue Agent in Buffalo, New York.

27. In October 2015, Taxpayer informed the R.A. of the CDP election, and the unlawfulness of collection activity until such hearing occurred, but did not hear from the R.A. for some time, though collection activity for 2013 began by Social Security levy.

28. In January 2017, counsel and co-counsel for Taxpayer met with the R.A. and his regional manager at the IRS offices in lower Manhattan.

29. At the meeting, counsels explained that not only was the ongoing collection activity unlawful, as Taxpayer had never had his CDP hearing, but also that a year earlier in April 2016, Taxpayer had filed a formal claim for a $695.051 refund for 2012 requesting it be applied as a credit elect to 2013, ¶ III.B.22, which would obviously more than cover the alleged $280.000 deficiency.

30. Presumably because of that meeting and the efforts of that regional manager, in March 2017 an R.A. at an Exam office in Corona, New York contacted Taxpayer to begin what was represented to be the process of reviewing his refund claims for 2011 and 2012. *But see* ¶¶ III.C.47, 48, 49.

31. Certainly, that characterization was and is still reasonable, because the R.A. initiated contact with this request for substantiation of Taxpayer's claim of foreign tax credits for 2011 to substantiate the overpayment claimed in the April and October 2015 amended returns and its use as a credit elect to 2012:

5

> | Form **4564** (Rev. September 2006) | Department of the Treasury – Internal Revenue Service **Information Document Request** | Request Number 610-0001 |
>
> To: (Name of Taxpayer and Company Division or Branch)
> NEBIL OZGEN
>
> Subject: Foreign tax Credit 2011
>
> SAIN number | Submitted to: NEBIL OZGEN
>
> Please return Part 2 with listed documents to requester identified below
>
> Dates of Previous Requests (mmddyyyy)
>
> Description of documents requested
> Tax Period(s):   201212
>
> Dear Nebil Ozgen,
>
>   We're writing you in reference to your 2012 1040 claim for refund in which you are claiming estimated tax payments applied from your 2011 1040 claim for refund.   So far, hopefully, I'm understanding your intent. However, I will need a copy of the check payment to the Republic of Turkey for $ 585,758 relative to your 2011 income tax obligation; plus any written correspondence (translated) from the Turkish government relative to the obligation along with a copy of the 2011 1040X.
>
>   Please send this information to the address provided below and include a phone number where you can be reached. Any questions please feel free to contact me at 718-760-6115. Note: This information is requested by 3/30/2017.
>
> Darrell Robinson IRA
>
>                Internal Revenue Service
>                One Lefrak City Plaza
>                Corona, New York 11368
>                SB/SE:S:E:MAN:1109:DAR

32. On April 14, 2017, after receiving an extension, counsel sent a response to the R.A., with a copy of the 2011 1040X and documentation of Taxpayer's right to claim the foreign tax credits for 2011 in question.

33. Subsequently, the R.A. asked for the same documentation for Taxpayer's claim of foreign tax credits for 2012. Again, counsel complied.

34. Counsel received no further word for months, so complained to the collection manager in Buffalo, who again gave much-appreciated support by apparently "asking" the Exam office involved to get going with the refund process.

35. Apparently in response, the R.A. was replaced with another R.A. in the same office, who informed counsel in late Summer of 2017 that he was satisfied with the documentation counsel had provided to substantiate foreign tax credits for 2011 and 2012, and needed only documentation to substantiate deductions claimed on the 2012 1040X. ¶ III.B.22.

6

36. The R.A., informed that such were overseas or in storage, graciously allowed enough time, and counsel supplied it, both over time and then again together in one final, 150-page delivery made by hand in early November 2017

37. On or before December 6, 2017, the R.A. called counsel and said that he was approving the entirety of those claimed itemized deductions so there would be no need to discuss formal or informal review rights because there would be nothing to review, as Taxpayer would be entirely prevailing. He also mentioned that he would be soon thereafter out of the office until January 2018.

38. On December 6, 2017, counsel received a facsimile from the R.A. which did not address anything whatsoever about 2011 so necessarily did not account for, include, or address the credit elect of $693.606 from 2011 to 2012 claimed by Taxpayer's 2011 1040X and substantiated by the documentation requested in the Exam process, ¶¶ 0, 33, 33, 35, so did not produce the $695.051 refund for 2012 that would have resulted. It did not explain any of this.

39. For avoidance of ambiguity, the fax was a "Statement of Proposed Changes," which has three columns, so allows three years on one form. Although one would have expected the R.A. would have used two columns, one for 2011, one for 2012, the $693,606 showing as a revised balance for 2011 due taxpayer, then used as a credit elect for 2012, the 2012 column reflecting that sum as a revised credit on account, finally showing a $695.051 credit to be carried to 2013, or, though it should not have been, some other numbers for 2011 reflecting perhaps a disallowance, along with an explanation, there was simply nothing on that form for the year 2011 or corresponding to it, as if the Exam office in question had never heard of the year or the refund claim for it.

40. On or about December 20, 2017 counsel spoke with the Appeals officer who had handled the equivalent proceeding, ¶ III.A.14. He said that their records showed that the letter of October 26, 2015, ¶ III.A.18, that the 2011 1040X would be sent to Appeals had been sent to Taxpayer in error and that the records he, with help from others, had been able to find showed that the 2011 1040X claim was in a Fresno, California office, apparently the office which had sent that letter, apparently sitting there all this time with no action taken.

41. He and others, they at practitioner priority, have independently confirmed that there is no record in Taxpayer's account of any formal notice of disallowance of all or part of the 2011 claim, or anything related to it.

42. Taxpayer has never received any formal notice of such disallowance.

43. Except as set forth immediately below, Taxpayer has never received any informal notice of such disallowance.

44. Taxpayer has never received any notice, formal or informal, that any part of the refund claimed for 2011 has been applied by the Commissioner in respect of any other liability for which he could lawfully apply it.

45. Therefore, the above, Taxpayer has never received any notice, formal or informal, that would suggest that there has been an accord and satisfaction, in whole or in part, with respect to that 2011 refund claim.

46. On December 29, 2017, at counsel's request, the Collections Regional Manager in Buffalo, sent a request to the R.A. who had prepared the Statement of Proposed Changes, and his manager, to have a conference call with him and with counsel on January 10, 2018.

47. That call did take place. During the call, the R.A. said that from his perspective, there had been a misunderstanding, that his office had only looked at 2011 for "carry" purposes, but not in general.

48. That is, as the R.A. confirmed he meant, when a year is under exam, and there is an item which could be affected by an item in a prior year, as might be the case with a net operating loss or foreign tax credit carryforward, even if that year is closed to assessment, the Service may examine it for the limited purpose of ensuring the carryforward has been correctly determined.

49. Whether or not this is what happened, and Taxpayer is not accusing that R.A. of impropriety, it remains the case that the prior R.A., by requesting the 2011 1040X refund claim for review, ¶ III.C.31, upon counsel's sending it, ¶ 0, both invited and received a legally operative refund claim for 2011.

50. (It may have been duplicative, but there is nothing known in administrative tax procedure that prohibits the filing of multiple identical claims.)

51. Thus, the second R.A.'s fax to counsel of the Statement of Proposed Changes which disregarded 2011 is an informal denial of the 2011 refund claim, both the two submitted formally in 2015 and the one submitted informally in 2017.

52. Even if it is not any kind of denial, the fact will remain that Taxpayer filed not one, but two, formal refund claims for 2011, as the Service has acknowledged, yet no action has been taken for longer than the six months required for suit.

53. To be sure, counsel spoke with practitioner priority on January 10, 2017, after that call, ¶ III.C.47, and was told the representative could see in the database she was looking at that Taxpayers records showed the Service had received in April 2015 a claim for refund for 2011 and as well in October 2015 an amended claim for refund for 2011, both by 1040X, and confirmed there was no evidence either had been acted on, let alone disallowed in any way.

54. (She also said her records showed the matter in Philadelphia, not Fresno.)

55. While the phrase "exhaust his administrative remedies" means a taxpayer, before a refund suit, must first (i) claim a refund; then (ii) if there has been no action, wait at least six months; Taxpayer believes the above sets forth a record that can only be said to give new meaning to the term "exhaust."

## IV. AD DAMNUM

56. While a credit elect is normally binding on a Taxpayer, that cannot be so if it is never approved. In other words, while a credit elect, when applied to the following year, becomes a payment in respect of that year, so cannot be subject to a refund claim for the year in which it arose (here, 2011), but must be subject to a refund claim for that following year, 2012, that cannot be if it has never been applied, *a fortiori* if it has been disallowed, in whole or in part.

57. For example, if the credit elect here, from 2011, had been approved but instead of being applied to 2012 had been sent to the Department of Education to satisfy a student loan mistakenly listed as in arrears from Taxpayer but in reality having nothing to do with him, there can be no question that an illegal exaction claim for that money would lie, rather than a claim for refund for 2012, because the money never got to 2012 (and there would be no refund

<ol start="58">
<li>

claim for 2011 because the refund had been issued, but (mis)used, thus there had been from that standpoint an accord and satisfaction).

</li>
<li>

Therefore, where. as here, the money never went anywhere, and still after all this time the government without right proverbially "has $700.000 of Taxpayer's money 'in its pocket,'" it is Taxpayer's right, as he does now exercise it, to sue for its return.

</li>
<li>

Regardless of form or theory, all of the above incorporated as if set forth here, Taxpayer demands, in addition to such other relief as the court may deem just and proper, (i) a refund, or the illegal exaction disgorgement equivalent, of $700.000 plus interest from the date of overpayment (about $650.000 in October 2012 and $43.000 in August 2014), since the Commissioner cannot claim that Taxpayer has waived a right to interest by a credit election that was never approved; (ii) in the alternative, that his accounts be properly credited with the overpayment as requested.

</li>
<li>

Notwithstanding the above, Taxpayer claims now, subject to reservation, only in respect of 2011, but puts the Service on notice that he may amend to include similar claims for 2012 and thereafter with respect to this issue.

</li>
</ol>

*****

January 12, 2018

Frederick M. Oberlander
Counsel for Plaintiff

**THE LAW OFFICE OF FREDERICK M. OBERLANDER, P.C.**

Post Office Box 1870
28 Sycamore Lane
Montauk, New York 11954
212.202.7624    Tel.
212.202.7624    Fax
fred55@aol.com